UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DANA N. ESCOFFIER,

                        Plaintiff,

-v-

CITY OF NEW YORK, SGT. BALUNAS, and OFFICER MARTE,

                        Defendants.

13-CV-3918 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

      Plaintiff Dana Escoffier, proceeding *pro se*, brings this action pursuant to 42 U.S.C. § 1983 ("Section 1983") against Defendant Officer Marte for alleged violations of Escoffier's Fourth Amendment rights, and against Defendants the City of New York and Sgt. Balunas for alleged violations of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq*. (Dkt. No. 152.) Defendants Officer Marte, the City of New York, and Sgt. Balanus (collectively, "Defendants") have now moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Dkt. No. 163.) For the reasons that follow, Defendants' motion for summary judgment is granted in part and denied in part.

I.    Background

    A.    Procedural History

      Escoffier commenced this action on June 6, 2013. (Dkt. No. 2.) On August 2, 2013, the Court ordered Escoffier to amend his complaint to meet the pleading requirements of Federal Rule of Civil Procedure 8 and to clarify his Section 1983 claims. (Dkt. No. 5.) Escoffier filed his first amended complaint on October 30, 2013, raising an assortment of legal claims against a long list of defendants that included the City of New York, Officer Marte, and Sgt. Balunas, as well as other named police officers and several John Doe and Jane Doe defendants. (Dkt. No. 8.)

1

On January 2, 2014, the Court once again ordered Escoffier to amend his complaint to comply with Federal Rule of Civil Procedure 8 (Dkt. No. 10), after which Escoffier filed his second amended complaint on February 24, 2014 (Dkt. No. 11). On May 1, 2015, Defendants filed a motion to dismiss Escoffier's second amended complaint (Dkt. No. 81), which the Court granted on February 11, 2016 as to "all but Plaintiff's ADA and Fourth Amendment claims" (Dkt. No. 94 at 10). On August 30, 2016, the Court dismissed Escoffier's claims against one of the named defendants, Detective Bernardes, for failure to effect timely service under Federal Rule of Civil Procedure 4(m) (Dkt. No. 117), and the Court thereafter dismissed Escoffier's claims against all John Doe and Jane Doe defendants as time-barred on July 27, 2017 (Dkt. No. 149).

Escoffier then filed a third amended complaint on September 20, 2017, naming as defendants only the City of New York, Marte, and Balunas, and including only those allegations that survived the Court's earlier orders — specifically, those that relate to Escoffier's Fourth Amendment and ADA claims. (Dkt. No. 152.) Discovery was ordered to be completed by January 29, 2018. (Dkt. No. 157.) After the close of discovery, Defendants filed their motion for summary judgment (Dkt. No. 163), which is now before the Court for resolution.

**B. Statement of Facts**

The following facts are undisputed unless otherwise noted.[1] On August 22, 2013, Escoffier called 911 from his apartment after catching his nephew stealing Escoffier's belongings. (Dkt. No. 166 ¶ 1.) Officers Marte and Anollino responded to Escoffier's call and knocked on Escoffier's door. (Dkt. No. 166 ¶¶ 2–3.) Escoffier opened the door and spoke to the officers. (Dkt. No. 166 ¶ 4.) Shortly thereafter, Sgt. Anderson and another officer arrived at

---

[1] Plaintiff's response to Defendants' statement of material undisputed facts appears at pages 67–71 of Docket Number 171. For the sake of brevity, the Court does not cite Plaintiff's responses except where they dispute Defendants' statement of the facts.

Escoffier's apartment. (Dkt. No. 166 ¶ 5.) Escoffier and his nephew were in the kitchen area near the doorway to the apartment while they were speaking to the officers outside of Escoffier's apartment. (Dkt. No. 166 ¶ 6.) Sgt. Anderson asked Escoffier's nephew to leave the apartment, which he did. (Dkt. No. 166 ¶ 7.)

At this point, Defendants allege that Escoffier told Sgt. Anderson to "come in" to the apartment. (Dkt. No. 166 ¶ 8.) Escoffier, however, disputes this, stating that he did not give Sgt. Anderson permission to enter and that he in fact said, "Why did you come in?" (Dkt. No. 171 at 68 ¶ 8.)[2] Sgt. Anderson entered Escoffier's apartment and took a pair of shoes for Escoffier's nephew. (Dkt. No. 166 ¶ 9.) Thereafter, Officer Marte tried to ascertain the reasons for Escoffier's 911 call while standing outside the doorway. (Dkt. No. 166 ¶ 10.) Escoffier then attempted to close the door on Officer Marte, but Officer Marte stuck his foot in the doorway to prevent Escoffier from closing the door. (Dkt. No. 166 ¶¶ 11–12.) Defendants assert that Escoffier at that point fully opened the door and let Officer Marte enter the apartment (Dkt. No. 166 ¶ 13), but Escoffier claims that Officer Marte's foot forced the door open and that Escoffier stopped trying to close the door because he was intimidated and did not want to struggle any further (Dkt. No. 171 at 68 ¶ 13).

Defendants allege that Officer Marte did not use physical force against Escoffier to enter the apartment, that Escoffier showed Officer Marte to his bedroom, and that Escoffier explained the items that Escoffier's nephew had taken and their approximate value. (Dkt. No. 166 ¶¶ 14–15.) Escoffier, on the other hand, disputes these facts, noting again that Officer Marte used his

---

[2] The document Plaintiff has filed in opposition to Defendants' motion for summary judgment (Dkt. No. 171) includes a brief, several exhibits, and a response to Defendants' statement of material undisputed facts. Because these items are merged into one document and have not been filed separately on the docket, the Court's citations to this document refer to the ECF page number.

foot to physically force Escoffier's door open and that Escoffier allowed Officer Marte to enter only because he felt coerced and intimidated by Officer Marte.  (Dkt. No. 171 at 68–69 ¶¶ 14–15.)  Following this incident, Police Administrative Aide Derobertis entered Escoffier's complaint against his nephew into the New York City Police Department's ("NYPD") system.  (Dkt. No. 166 ¶ 16.)

Between May 12, 2011, and May 31, 2016, Escoffier registered another ten complaints with the 6th precinct of the NYPD regarding various incidents.  (Dkt. No. 166 ¶ 17.)  The incidents ranged from altercations Escoffier had with others to noise complaints.  (Dkt. No. 166 ¶¶ 18–39.)  As with the August 22, 2013 incident described above, the NYPD prepared and filed complaint reports for each of Escoffier's ten other complaints.  (*Id.*)  Defendants allege that the NYPD did not lose any of Escoffier's complaint reports after filing them (Dkt. No. 166 ¶ 40), but Escoffier contends that the 6th precinct would refer to complaint reports that they did not investigate or act upon as "lost" (Dkt. No. 171 at 70 ¶ 40).

## II. Legal Standard

Under Federal Rule of Civil Procedure 56(a), a court shall grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  No genuine dispute exists if, "viewing the record as a whole in the light most favorable to the nonmoving party, a rational trier of fact could not find for the nonmoving party."  *United States v. Ogonoski*, 149 F. App'x 24, 25 (2d Cir. 2005) (summary order).  Merely "rais[ing] 'metaphysical doubt' as to the material facts" is insufficient to create such a dispute.  *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  Instead, once the movant has pointed out that there is an "absence of evidence" to support the nonmovant's position on an issue as to which the nonmovant bears the burden of proof, *Feurtado v. City of New York*, 337 F. Supp. 2d 593, 599

4

(S.D.N.Y. 2004) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)), "the nonmoving party must come forward with specific facts supported by sufficient concrete probative evidence to allow a rational trier of fact to find for her," *Ogonoski*, 149 F. App'x at 25.

Additionally, "[i]t is well established that a court is ordinarily obligated to afford a special solicitude to *pro se* litigants." *Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010) (citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474–75 (2d Cir. 2006) (per curiam)). "The solicitude afforded to *pro se* litigants takes a variety of forms. It most often consists of liberal construction of pleadings, motion papers, and appellate briefs." *Tracy*, 623 F.3d at 101 (citing *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam)). In the summary judgment context, this requires interpreting the *pro se* litigant's arguments to raise the strongest arguments they suggest. *Nieblas-Love v. N.Y.C. Hous. Auth.*, 165 F. Supp. 3d 51, 65 (S.D.N.Y. 2016). But the "application of this different standard does not relieve plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003) (citation omitted). Thus, "when confronted with evidence of facts that would support judgment in the defendant's favor as a matter of law," the *pro se* litigant "must come forward with evidence in admissible form that is capable of refuting those facts." *Saldana v. Local 32B-32J Serv. Emps. Int'l Union*, No. 03 Civ.1853, 2005 WL 66895, at *2 (S.D.N.Y. Jan. 12, 2005).

### III. Discussion

As noted above, the only claims remaining in this case are Escoffier's claims of unlawful entry under the Fourth Amendment and discrimination under the ADA. (Dkt. No. 94 at 10.)

Defendants move for summary judgment on both of these claims. (*See* Dkt. No. 165 at 5–13.)[3] The Court addresses each claim in turn, but first considers Escoffier's request that the Court exclude his deposition testimony from the summary judgment record.

### A. Deposition Testimony

In an effort to modify the summary judgment record, Escoffier appears to argue that the Court should not consider his deposition testimony or, in the alternative, should consider his testimony with the revisions Escoffier has provided because there were two flaws in the way his deposition was conducted. (Dkt. No. 171 at 2–5.) Escoffier asserts (1) that his deposition exceeded the maximum of seven hours permitted under Federal Rule of Civil Procedure 30(d)(1); and (2) that his traumatic brain injury impaired his memory during the deposition, affecting the reliability of his answers. (*Id.*) Based on the transcript, Escoffier's deposition began at 10:24 a.m. and concluded at 6:11 p.m. (Dkt. No. 173-1 ("Pl. Dep.") at 1; Dkt. No. 173-2 at 280), for a total of seven hours and forty-seven minutes. Defendants note that there were several breaks, including a lunch recess, taken during the deposition, all of which together totaled approximately forty-seven minutes. (Dkt. No. 172 at 5.) As breaks do not count towards Rule 30's seven-hour limit, Escoffier's first contention lacks merit. *See Williams v. Fire Sprinkler Assocs. Inc.*, No. 15 Civ. 3147, 2017 WL 1156012, at *2 (E.D.N.Y. Mar. 27, 2017) ("Only time spent actually taking the deposition, not breaks, counts toward the seven hours."

---

[3] As the Court has not relied on Escoffier's Affidavit and Reply in Support of Cross-Motion for Summary Judgment (Dkt. No. 174) to rule on this motion, Defendants' motion to strike the document is denied as moot (Dkt. No. 177).

To the extent that the document can be construed as a cross motion for summary judgment (*see* Dkt. No. 174 ¶ 14), the motion is denied. Because Escoffier's surviving Fourth Amendment claims turn on disputed issues of material fact, their resolution must await a trial.

(quoting *Rahman v. The Smith & Wollensky Rest. Grp., Inc.*, No. 06 Civ.6198, 2009 WL 72441, at *4 (S.D.N.Y. Jan. 7, 2009))).

Escoffier's arguments that his traumatic brain injury impaired him during the deposition and that Defendants did not reasonably accommodate Escoffier's needs in this regard are equally unavailing. Based on the transcript itself, Magistrate Judge Freeman was consulted during the deposition regarding Escoffier's potential memory impairments (Pl. Dep. at 49:16–51:17) and advised Escoffier that he should try his "best to remember" but that if he had a "memory issue, [or] a physical issue" he "should indicate that clearly on the record, so that nobody thinks it's a firm memory when in facts it's a vague one" (Pl. Dep. at 53:1–25). Escoffier had no apparent problem following these instructions. (*E.g.*, Pl. Dep. at 81:7–18, 86:10–15.)

Escoffier also submitted an errata sheet to correct what he claims to be inaccurate testimony in his deposition. (Dkt. No. 164-1 at 145.)[4] The Court will not consider this errata sheet as it is self-serving and provides no explanation for the revisions. *See Barnes v. Ross,* No. 12 Civ. 1916, 2014 WL 1329128, at *11 (S.D.N.Y. Apr. 3, 2014) ("[A] district court is 'on firm ground' if it does not credit an errata sheet that reflects a party's attempt to 'retrieve the situation by scratching out and recanting his original testimony . . . .'" (quoting *Podell v. Citicorp Diners Club, Inc.*, 112 F.3d 98, 103 (2d Cir. 1997))). Here, many of Escoffier's substantive changes would materially alter the implication of his initial testimony. For example, Escoffier's errata sheet states that he did not give Sgt. Anderson permission to enter his apartment. (Dkt. No. 164-1 at 145.) But, during his deposition, when discussing the August 22, 2013 incident, Escoffier said of his own accord that he "gave Anderson permission" to enter. (Pl. Dep. at 91:18–21.)

---

[4] This is the ECF page number because the errata sheet is attached to the deposition transcript and does not have its own page number.

When Defendants' counsel followed up on this issue and asked how Escoffier gave Sgt. Anderson permission, Escoffier stated, "I said, 'Come in.'" (Pl. Dep. at 91:22–23.) Given the clarity of Escoffier's initial testimony, the errata sheet appears to be an attempt to recant his original testimony and thus, the Court does not consider it.

### B. Fourth Amendment

Escoffier's Fourth Amendment claim, which he asserts against Officer Marte alone, challenges Officer Marte's placement of a foot in the doorway of the dwelling, preventing the door from closing, as well as his subsequent entry into his apartment. Escoffier's chief argument is that Officer Marte intimidated Escoffier and forced his way into the apartment. (Dkt. No. 171 at 7.) For purposes of the summary judgment analysis, the Court must credit the facts as shown by Escoffier, drawing all reasonable inferences in his favor.

Officer Marte was one of four officers who responded to the 911 call placed by Escoffier. Officer Marte remained outside the doorway of the apartment and began a conversation with Escoffier that became hostile. (Pl. Dep. at 94:12–22.) According to Escoffier, Officer Marte put on gloves, clenched his fists, and repeatedly punched one hand into the palm of the other, which intimidated Escoffier and prompted him to close his door. (Pl. Dep. at 95:10–16.) When Escoffier sought to close his door, Officer Marte placed his foot in the doorway, preventing Escoffier from doing so. (Pl. Dep. at 95:16–18.) Escoffier claims that he attempted to close the door several times and asked Officer Marte to remove his foot several times, but Officer Marte said, "Nope, nope." (Pl. Dep. at 95:18–23.) After this back and forth, Escoffier claims, he attempted to "win over" Officer Marte and told Officer Marte that Escoffier's nephew took "more than just a little bit. Let me show you." (Pl. Dep. at 100:12–13.) Subsequently, Escoffier let Officer Marte into Escoffier's apartment. (Pl. Dep. at 100:14–18.) Escoffier confirmed that Officer Marte did not push him or make any physical contact with Escoffier to get into his

8

apartment, and that Officer Marte did not draw his firearm. (Pl. Dep. at 100:19–101:11, 102:10–11.)

The Fourth Amendment prohibits unreasonable searches and seizures. *See* U.S. Const. amend. IV. Although "a warrantless search of a home is generally unreasonable," "an individual may consent to a search, thereby rendering it reasonable." *United States v. Garcia*, 56 F.3d 418, 422 (2d Cir. 1995). Consent need not be verbal; it "can be found from an individual's words, acts or conduct." *Krause v. Penny*, 837 F.2d 595, 597 (2d Cir. 1988). But it is valid only if it is "voluntary," *Ohio v. Robinette*, 519 U.S. 33, 40 (1996), which "is a question of fact to be determined from the totality of all the circumstances," *Schneckloth v. Bustamonte*, 412 U.S. 218, 221 (1973). In short, then, the question is whether it was "objectively reasonable for the officer to believe that the scope of the suspect's consent," if voluntary, "permitted him to [conduct the search]." *Florida v. Jimeno*, 500 U.S. 248, 249 (1991).

A prevenient consideration, however, is the doctrine of qualified immunity. Qualified immunity protects officials from suit if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In qualified immunity cases, the Supreme Court has cautioned that "courts should think hard, and then think hard again," before "determin[ing] whether a right exists before examining whether it was clearly established." *Camreta v. Greene*, 563 U.S. 692, 706–07 (2011). Accordingly, this Court first considers whether Officer Marte's conduct, as characterized by Escoffier, violated a "clearly established" right. *Harlow*, 457 U.S. at 818.

To be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v.*

*Creighton*, 483 U.S. 635, 640 (1987). "[E]xisting precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). This inquiry must be "particularized" to the facts of the case, *Anderson*, 483 U.S. at 640 — although, of course, "officials can still be on notice that their conduct violates established law even in novel factual circumstances," *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

Thus, in this case, the relevant question is whether clearly established law prohibited Officer Marte's *particular* conduct — specifically, (1) placing a foot in the doorway, preventing the door from closing, and (2) putting on gloves, clenching fists, and repeatedly punching one hand into the palm of the other before entering the dwelling.

### 1. Officer Marte's placement of his foot in the doorway.

The parties have not cited, and the Court is not aware of, any relevant Supreme Court or Second Circuit law specifically addressing the legality of an officer placing her foot in the doorway of a dwelling, without a warrant, in order to prevent the door from shutting. Thus, the Court looks to the decisions of "other circuit courts" to determine if they "clearly foreshadow a particular ruling on the issue." *Scott v. Fischer*, 616 F.3d 100, 105 (2d Cir. 2010) (quoting *Varrone v. Bilotti*, 123 F.3d 75, 79 (2d Cir. 1997)).

One helpful guidepost is *Dalcour v. City of Lakewood*, 492 F. App'x 924 (10th Cir. 2012). That case involved two police officers conducting an unannounced welfare check at a residence. *Id.* at 927. After the officers knocked on the door, the resident, who open[ed] the door just wide enough to talk to [the officers]," refused to answer questions or let the officer into her home. *Id*. at 928. One officer put her foot in the doorway to keep the resident from shutting the door. *Id.* In response, the resident attempted to "force the door closed," slamming it against the officer. *Id.* The officer kept her foot in the doorway until three other officers arrived, at which point they forced their way into the apartment. The Tenth Circuit held that the officer was

10

not entitled to qualified immunity because, "based on the extensive Supreme Court and Tenth Circuit precedent emphasizing the significance of any physical intrusion into a home, a reasonable officer should have known that placing a foot into the doorway amounted to an entry of the home for Fourth Amendment purposes." *Id*. at 934.

*Dalcour* guides the analysis here. As the *Dalcour* court indicates, there is indeed "extensive" Supreme Court and Second Circuit precedent emphasizing that *any* physical intrusion into the home, however slight, is a search that triggers Fourth Amendment scrutiny. *Dalcour*, 492 F. App'x at 934. "[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *United States v. U.S. Dist. Court*, 407 U.S. 297, 313 (1972). Accordingly, "any physical invasion of the structure of the home, 'by even a fraction of an inch,' [i]s too much." *Kyllo v. United States*, 533 U.S. 27, 37 (2001) (quoting *Silverman v. United States*, 365 U.S. 505, 512 (1961)); *see also Loria v. Gorman*, 306 F.3d 1271, 1284 (2d Cir. 2002) ("No invasion of the sanctity of the home can be dismissed as *de minimis*."); *United States v. Gori*, 230 F.3d 44, 52 n.3 (2d Cir. 2000) ("Breaking the threshold of the doorway trigger[s] the warrant requirement . . . ."). These precedents clearly establish that Officer Marte's intrusion into Escoffier's home was a Fourth Amendment search necessitating a warrant.

It is equally clear, under Supreme Court precedent, that "searches [of] a home without a warrant are presumptively unreasonable," *Payton v. New York*, 445 U.S. 573, 586 (1980). This rule admits of only two exceptions: exigent circumstances or consent. *See Steagald v. United States*, 451 U.S. 204, 216 (1981) ("[W]arrantless searches of a home are impermissible absent consent or exigent circumstances . . . ."). In this case, there is no suggestion that Officer Marte placed his foot in the doorway because of an exigency. (*See* Dkt. No. 165 at 14–15; Dkt. No.

172 at 10–11.) Instead, Officer Marte suggests he "reasonably believed that he had consent" to "st[i]ck his foot in Plaintiff's door." (Dkt. No. 172 at 10.)

No reasonable officer, however, could believe that Escoffier was providing consent on Escoffier's version of the facts. Consent must either be express or reasonably implied from the surrounding circumstances — from "an individual's words, acts or conduct." *Krause v. Penny*, 837 F.2d 595, 597 (2d Cir. 1988). Here, there was no express consent for Officer Marte to enter the dwelling. And the "surrounding circumstances" distinctly preclude the possibility of reasonably finding consent. The interaction between Officer Marte and Escoffier had become "acrimonious" and "hostile." (Pl. Dep. at 94:20, 95:3.) Escoffier had "decided [he] would close [the] door" but was then blocked by Officer Marte, who "pushed the door open with his foot[] and kept it there." (Pl. Dep. at 95:16–18.) After the foot had been placed in the doorway, Escoffier "tried to close the door several times" on Officer Marte's foot (Pl. Dep. at 95:18–19). Escoffier "asked him to remove his foot several times" and "told him [he] was going to close the door" (Pl. Dep. at 95:21–22). On these facts,[5] a claim of consent is undermined by the surrounding circumstances. Officer Marte's conduct therefore violated clearly established law.

Officer Marte disagrees, citing *Smith v. City of Wyoming*, 821 F.3d 697 (6th Cir. 2016). There, a "knock and talk" conducted by a police officer at a residence resulted in the resident attempting to shut the door on the officer. *See id.* at 713. In response, the officer "briefly" placed his foot in the doorway, which permitted the officer "to conclude the talk" before "remov[ing] his foot and allow[ing] the door to close." *See id.* The Sixth Circuit afforded

---

[5] Again, the Court must credit the facts as shown by Escoffier, drawing all reasonable inferences in his favor.

qualified immunity to the officer, citing an absence of clearly established law that prohibited such conduct. *See id.* at 714.

*Smith*, however, is inapposite. The *Smith* court was careful to cabin its holding to intrusions that "briefly extend a consensual interview" long enough only to "conclude the talk." *Id.* Crucially, the officer in *Smith* "did not persist in questioning [the resident] after she attempted to close the door" and only caused her to "pause briefly" before allowing the door to close. *Id.* Further, the *Smith* court expressly distinguished *Dalcour* because the officer in that case "kept her foot in the doorway of a home despite the occupant repeatedly attempting to slam the door shut, long enough for reinforcements to arrive." *Id.* (internal quotation marks omitted). Here, too, Officer Marte "kept [his] foot in the doorway of a home despite the occupant repeatedly attempting to slam the door shut." *Id.* And in no sense can the interaction be described as "brief[]." *Id.* Nor did Officer Marte eventually "allow[] the door to close." *Id.* On *Smith*'s own terms, then, Officer Marte is not entitled to qualified immunity.

Supreme Court precedent clearly establishes — and *Dalcour* and *Smith* reaffirm — that Officer Marte violated Escoffier's Fourth Amendment rights. Thus, the Court denies qualified immunity to Officer Marte for placing a foot in the doorway of Escoffier's home.

### 2. Officer Marte's subsequent entry.

Officer Marte's subsequent entry into Escoffier's dwelling, however, is a different matter. After Officer Marte refused to remove his foot from the doorway, Escoffier told him, "What [my nephew] has taken is more than just a little bit. Let me show you." (Pl. Dep. 100:12–13.) Escoffier then "show[ed] the police where the items were kept in [his] apartment." (Pl. Dep. 99:13–14.) Accordingly, Officer Marte claims that the entry was entirely consensual (*see* Dkt. No. 165 at 12) — which, if true, would render Escoffier's Fourth Amendment claim nugatory. *See, e.g.*, *Garcia*, 56 F.3d 418, 422 (2d Cir. 1995) ("So long as the police do not coerce consent,

a search conducted on the basis of consent is not an unreasonable search."). But Escoffier also asserts that consent to enter was obtained only after Officer Marte repeatedly "punch[ed] one fist into the other as he looked at [Escoffier]," causing him to "feel[] threatened." (Pl. Dep. at 95:13–16.) Further, Escoffier claims, when the door was closed on Officer Marte's foot, he "kept the door open with his foot and leg," refusing to move it even though Escoffier "asked him to remove his foot several times." (Pl. Dep. at 95:20–21.)

For purposes of the qualified immunity analysis, the question is whether such conduct, if used to obtain consent to enter a dwelling, violated clearly established law. It is black-letter law that the Fourteenth Amendment "requires that a consent not be coerced, by explicit or implicit means, by implied threat or covert force." *Bustamonte*, 412 U.S. at 228; *see also United States v. Watson*, 423 U.S. 411, 424 (1976); *United States G*. As one prominent treatise observes: "quite obviously, 'officers do not have the right to use any degree of physical force or threatened force to coerce an individual to consent to a warrantless search of his home.'" 4 Wayne R. LaFave, Search & Seizure § 8.2(b) (5th ed. 2012) (quoting *Hemphill v. Hale*, 677 F.3d 799, 801 (8th Cir. 2012)).

Given the clarity of this rule, "no reasonably competent officer" could conclude that Officer Marte's conduct was lawful. *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Officer Marte's actions — in particular, repeatedly punching his clenched fist into the palm of his other hand — constituted a threat of physical force. Thus, at the time of the encounter, it was clearly established that Officer Marte's entry into the dwelling was nonconsensual and therefore violated the Fourth Amendment.

Accordingly, the Court denies qualified immunity to Officer Marte for his entry into Escoffier's dwelling.

C.     ADA

Escoffier also alleges that the City of New York and Sgt. Balunas discriminated against him due to his disability in contravention of the ADA. In his complaint, Escoffier alleges (a) that he was not permitted to register legitimate complaints with the NYPD, and (b) that his complaints were not investigated or were disregarded because of his traumatic brain injury. (Dkt. No. 152 at 4 ¶ 3.) In his opposition, however, Escoffier argues that the "issue of fact is not whether reports were taken, but that there were no investigations or arrests resulting from an investigation," which Escoffier believes was due to his disability. (Dkt. No. 171 at 25.)

To establish an ADA claim under Title II, "a plaintiff must demonstrate that '(1) he is a qualified individual with a disability; (2) the defendant is subject to [Title II]; and (3) he was denied the opportunity to participate in or benefit from the defendant's services, programs, or activities, or was otherwise discriminated against by the defendant because of his disability.'" *Disabled in Action v. Bd. of Elections in the City of N.Y.*, 752 F.3d 189, 196–97 (2d Cir. 2014) (footnote omitted) (quoting *McElwee v. Cty. of Orange*, 700 F.3d 635, 640 (2d Cir. 2012)). For the purposes of this motion, the Court assumes that Escoffier is a qualified individual and that Defendants are subject to the provisions of Title II.

Defendants City of New York and Sgt. Balunas are entitled to summary judgment as to Escoffier's ADA claim because no reasonable factfinder could conclude that Defendants denied Escoffier access to benefits due to his disability. Escoffier rightly concedes that there is no evidence suggesting he was not permitted to register legitimate complaints with the NYPD — indeed, it is undisputed that Escoffier was permitted to file eleven complaints and that the NYPD

15

prepared a Complaint Report for each of the eleven.[6] (Dkt. No. 171 at 69–70 ¶¶ 16–39.) Therefore, the only issue is whether Defendants' decision not to investigate the complaints was a result of discrimination against Escoffier's disability.

The crux of Escoffier's argument is that Defendant Sgt. Balunas and other NYPD officers made disparaging remarks regarding Escoffier's mental state, which, Escoffier maintains, raises a genuine dispute regarding whether Defendants refused to investigate Escoffier's complaints because of his disability. (Dkt. No. 171 at 13–16, 18–24.) Escoffier's argument is unavailing. Escoffier has not uncovered any evidence showing that the NYPD deviated from its standard practice in registering and investigating Escoffier's complaints. Specifically, there is no indication that the NYPD treated Escoffier's complaints differently from any similarly situated comparators due to Escoffier's disability. Disparaging remarks, to the extent they were made, do not provide evidence of differential treatment. Accordingly, no reasonable factfinder could conclude that the City of New York's or Sgt. Balunas's alleged actions in this case would constitute a violation of the ADA. Therefore, summary judgment is warranted.

---

[6] In his response to Defendants' Statement of Material Undisputed Facts, Plaintiff alleges two instances in which he sought to file a complaint with the NYPD but in which the officers at the 6th precinct refused to take down a report. (Dkt. No 171 at 70 ¶ 41.) These newly alleged incidents supposedly took place on April 22, 2016, and June 14, 2018. The Court will not consider these additional allegations at this stage of the litigation. "[T]he practice of adding new allegations only after the close of discovery and a motion for summary judgment greatly diminishes the utility of summary judgment, and compromises the district court's ability to identify genuine issues of fact." *Bright v. Coca-Cola Refreshments USA, Inc.*, 639 F. App'x 6, 9 (2d Cir. 2015) (summary order) (internal quotation marks, brackets, and citation omitted) (citing *Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir.1969)). This is especially warranted where the new allegations contradict prior testimony, *see id*. at 8, which is the case here, as Plaintiff stated at his deposition that he believed the eleven complaints that were identified were the complete set at issue (Pl. Dep. at 202:22–203:3).

## IV. Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED in part and DENIED in part.

The Clerk of Court is directed to close the motions at Docket Numbers 163 and 177.

SO ORDERED.

Dated: September 30, 2019
New York, New York

_____
J. PAUL OETKEN
United States District Judge

*COPY MAILED TO PRO SE PARTY BY CHAMBERS*

17